UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

| | |
|---|---|
| IN RE ) | |
| ) | Chapter 11 |
| FOUNTAINS OF BOYNTON ) | |
| ASSOCIATES, LTD. ) | |
| ) | Case No. 16-11690-EPK |
| ) | |
| Debtor. ) | |
| ) | |

**OBJECTION OF HANOVER ACQUISITION 3 LLC TO DISCLOSURE STATEMENT**

Creditor Hanover Acquisition 3 LLC ("Hanover"), by and through undersigned counsel, objects (the "Objection") to the Disclosure Statement for Plan of Reorganization Proposed by Fountains of Boynton Associates, Ltd. (Docket No. 68) (the "Disclosure Statement") filed by Fountains of Boynton Associates, Ltd. ("Debtor").  In support of the Objection, Hanover respectfully represents as follows:

**JURISDICTION AND VENUE**

1. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 1334 and 157(a).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

**BACKGROUND**

2. Hanover is the secured lender with respect to a December 28, 2006 loan made to Debtor in the original principal amount of $52,000,000.00 (the "Loan").

3. Under the Loan, Debtor is obligated, among other things, to make principal and interest payments to Hanover in the amount of $292,422.00 on the first day of each month ("Monthly P&I Payments").

4. Debtor defaulted under numerous provisions in the documents evidencing and/or securing the Loan, including, among others, the failure to timely make Monthly P&I Payments, to timely pay real property taxes, to satisfy a judgment lien that attached to the Collateral (as defined in paragraph 9 below) and to provide evidence of insurance.

5. As a result of the multiple defaults under the Loan, Hanover commenced a lawsuit seeking foreclosure of the Collateral and damages against John B. Kennelly for breach of his guaranty obligations with respect to the Loan, which lawsuit is pending in the Circuit Court, Fifth Judicial Circuit, in and for Palm Beach County, Florida as Case No. 2012-CA-019645 (the "Foreclosure Suit").

6. Hanover filed a Motion in the Foreclosure Suit seeking the appointment of a receiver with respect to the Collateral (the "Receiver Motion").

7. On February 5, 2016 (the "Petition Date") (the eve of the hearing on the Receiver Motion), Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code"), thereby commencing the above-captioned bankruptcy case (the "Bankruptcy Case").

8. Debtor's sole business is as the owner of single asset real estate (as such term is defined in Bankruptcy Code Section 101(51B)) in the form of a retail center in West Palm Beach, Florida, comprised of real property and multiple buildings with multiple commercial tenants commonly referred to as the "Fountains of Boynton." Debtor continues to operate its business pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

9. On May 5, 2016, Hanover timely filed its proof of claim in the Bankruptcy Case, which appears on the claims register as Claim 3-1 (the "Claim"). The Claim was filed as a

secured claim in the amount of $52,213,695.21.[1] The Claim is secured by all real, personal and intangible property of Debtor (collectively, the "Collateral"). On Schedule D, Debtor listed the value of the Collateral as $71,400,000.00. Debtor has not objected to the Claim.

10. As of the Petition Date, Debtor was delinquent in paying approximately twelve months of Monthly P&I Payments and was in default under the Loan for multiple other reasons. As set forth in the Claim, if the Loan balance had not been accelerated, the amount necessary to cure the arrearage on the Claim would be $7,079,325.32.

11. On May 5, 2015, Debtor filed its Chapter 11 Plan of Reorganization at Docket No. 67 (the "Plan") and the corresponding Disclosure Statement.

**PRELIMINARY STATEMENT**

12. The Plan seeks to severely impair the Claim by reducing the interest rate, providing for a period of interest only payments and extending the maturity date of the Loan for approximately three years. In providing specific information regarding this treatment of the Claim, Debtor improperly uses $47,600,000 as the amount of the Claim rather than the actual allowed amount of the Claim which, as set forth in the Claim, is $52,213,695.21 as of the Petition Date.[2] As a result, any proposed payouts and projections set forth in the Disclosure Statement are severely inaccurate. Accordingly, the Disclosure Statement does not contain adequate information to allow creditors to make an informed decision on the Plan as required by Section 1125(b) of the Bankruptcy Code. Further, the Disclosure Statement does not contain adequate information because it does not contain a liquidation analysis or an adequate description of the means for implementing the Plan. Moreover, the Disclosure Statement should

---

[1] Debtor's Schedule D lists the Claim as being secured in the amount of $52,000,000.00, and it does not indicate that the Claim is either "contingent," "unliquidated" or "disputed."

[2] Such amount has increased since the Petition Date because the adequate protection payments being made by Debtor do not cover even the note rate (non-default rate) interest due under the Loan.

3

not be approved because the Plan is unconfirmable on its face, *inter alia*, for the following reasons: (i) it is not feasible; (ii) it is not fair and equitable with regard to the Claim; and (iii) it violates the absolute priority rule. Accordingly, the Disclosure Statement should not be approved.

## ARGUMENT

**I.     The Disclosure Statement Fails to Provide Adequate Information Pursuant to Section 1125(b) of the Bankruptcy Code and Cannot Be Approved.**

13.     Under the Bankruptcy Code, every holder of a claim or interest must receive a court-approved written disclosure statement containing "adequate information" about a proposed plan before its vote on that plan may be solicited. 11 U.S.C. 1125(b); *Enron Corp. v. New Power Co. (In re New Power Co.)*, 438 F.3d 1113, 1117 (11th Cir. 2006). The Bankruptcy Code defines "adequate information" as

> [I]nformation of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such hypothetical investor of the relevant class to make an informed judgment about the plan. . . .

11. U.S.C. § 1125(a)(1).

14.     A disclosure statement must contain adequate information to allow creditors to make an informed decision on the debtor's plan for reorganization. *See In re New Power Co.*, 438 F.3d at 1118; *see also In re Phoenix Petroleum Co.*, 278 B.R. 385, 392 (Bankr. E.D. Pa. 2001) ("Thus, it is understood that the general purpose of the disclosure statement is to provide 'adequate information' to enable 'impaired' classes of creditors and interest holders to make an informed judgment about the proposed plan and whether to vote in favor of or against that

plan."); *In re Coastal Realty Inv., Inc.*, No. 12-20564, 2013 WL 214235 (Bankr. S.D. Ga. Jan. 17, 2013) (disclosure statement must provide creditors the "information necessary to make informed judgments about the [] Plan").

15. Accordingly, a disclosure statement should include all factors known to the debtor that bear upon the success or failure of the plan. *See Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996) ("Because creditors and the bankruptcy court rely heavily on the debtor's disclosure statement in determining whether to approve a proposed reorganization plan the importance of full and honest disclosure cannot be overstated."). Whether a disclosure statement includes adequate information to satisfy Section 1125(b) of the Bankruptcy Code is made on a case-by-case basis. *See Menard-Sanford v. Mabey (In re A.H. Robins, Co.)*, 880 F.2d 694, 696 (4th Cir. 1989); *In re Brandon Mill Farms, Ltd.*, 37 B.R. 190, 192 (Bankr. N.D. Ga. 1984).

16. Here, the Disclosure Statement fails to provide adequate information because it lacks basic disclosure with respect to the key components of the Plan.

    A.    *The Disclosure Statement Fails to Provide Adequate Information Regarding the Treatment of the Claim Under the Plan.*

17. The Disclosure Statement is wholly inadequate because it understates the allowed amount of the Claim by nearly $5 million. Under Section 502, "[a] claim or interest, proof of which is filed . . . is deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502. Rule 3001(f) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") provides a clear statement of the evidentiary effect of a properly filed proof of claim: it "shall constitute prima facie evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f). The Claim was timely filed and no objection to the Claim has been filed. Accordingly, it is deemed allowed in the amount filed, which is $52,213,695.21 rather than the $47,600,000 figure utilized

by Debtor in the Disclosure Statement. This material understating of the allowed amount of the Claim impacts Debtor's ability to fund the payments to creditors proposed in the Plan. Creditors should be given the opportunity to evaluate the Plan with the benefit of accurate information regarding the amount of the Claim. Accordingly, the Disclosure Statement fails to provide adequate information as required by Section 1125(b) of the Bankruptcy Code.

      B.     *The Disclosure Statement Fails to Provide an Adequate Liquidation Analysis.*

      18.     The Disclosure Statement lacks a liquidation analysis that will allow its creditors and parties-in-interest to properly evaluate the Plan. In order to provide adequate information consistent with the Bankruptcy Code's requirements, a disclosure statement must disclose pertinent financial information regarding the debtor and the anticipated plan of reorganization. *See In re Cardinal Congregate I,* 121 B.R. 760, 764-65 (Bankr. S.D. Ohio 1990). Specifically, a disclosure statement must include a liquidation analysis setting forth the amounts creditors would likely receive under a hypothetical chapter 7 liquidation. *In re Sierra-Cal*, 210 B.R. 168, 177 (Bankr. E.D. Cal. 1997); *see also In re William F. Gable Co.*, 10 B.R. 248, 250 (Bankr. N.D. W. Va. 1981) (ordering that the debtor's amended disclosure statement must include a liquidation analysis).

      19.     With respect to the requirement for a liquidation analysis, the Disclosure Statement's states, in pertinent part:

> The Plan Proponent *believes* that each holder of an Allowed Claim will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code on such date. In particular, all creditors are being paid 100% of the allowed amounts of their claims under the Plan. By definition, creditors could not be paid more in a Chapter 7 liquidation.

(Disclosure Statement, p. 21 (emphasis added).)  These statements amount to nothing more than conclusory remarks based upon Debtor's biased, unsupported, conjecture.  There simply is no actual analysis as to whether creditors would fare better in a liquidation scenario.

20.     Indeed, based upon Debtor's valuation of the Collateral, it appears as though, if Debtor liquidated the Collateral, all creditors could be paid in full in one lump sum, rather than being paid over time.  In this regard, Debtor's Schedule D states that the value of the Collateral is $71,400,000.00.  Thus, utilizing Debtor's own estimated value of its assets, all creditors could be paid in full upon a liquidation of the Collateral, even taking into consideration that less than full market value may be received in a "distressed sale" as Debtor suggests.  Based upon the claims amounts set forth in the Disclosure Statement, even if all claims were allowed in full and even taking into account the actual allowed amount of the Claim ($52,213,695.21) (i.e., almost $5 million more than the $47.6 million figure utilized by Debtor in the Disclosure Statement), the total amount of allowed claims would be significantly less than $55 million.  (*See* Disclosure Statement, p. 8.)  Even if the liquidation of the Collateral yielded $16.4 million[3] less than the value that Debtor attributed to the Collateral, there would still be more than enough funds to pay all creditors in full.  Certainly, there could be some disagreement about these calculations, but the point is that Debtor completely side-stepped conducting any such analysis.  Accordingly, the Disclosure Statement does not contain adequate information as required by Section 1125(b) of the Bankruptcy Code.

C.     *The Disclosure Statement Fails to Provide any Adequate Explanation of the Means for Implementing the Plan.*

21.     Section IV.H. of the Disclosure Statement is entitled "Means for Implementation and Effect of Confirmation of the Plan."  (Disclosure Statement, p. 15.)  Interestingly, that

---

[3] This figure is the difference between Debtor's $71,400,000.00 valuation of the Collateral and the $55,000,000 high-end estimation of the total claims against Debtor.

section of the Disclosure Statement actually provides no information regarding what funds will be used to implement the Plan. Accordingly, one is left to speculate that it is merely Debtor's cash flow that will be used to fund the payments due under the Plan.[4] Creditors should not be left to this "guesswork." Rather, they should be provided with adequate information upon which to evaluate the Plan. Since no information regarding the means for implementing the Plan exists in the Disclosure Statement, the Disclosure Statement does not contain adequate information as required by Section 1125(b) of the Bankruptcy Code.

II. **The Disclosure Statement Should Not be Approved When it is Apparent that the Accompanying Chapter 11 Plan of Reorganization is Not Confirmable.**

22. "[I]t is now well accepted that a court may disapprove of a disclosure statement, even if it provides adequate information about a proposed plan, if the plan could not possibly be confirmed." *In re Main Street AC, Inc.*, 234 B.R. 771, 775 (Bankr. N.D. Cal. 1999); *see also In re Sagamore Partners, Ltd.*, No. 11-37867-AJC, 2012 WL 2856104 (Bankr. S.D. Fla. 2012) (denying approval of the disclosure statement when the plan was facially unconfirmable). Therefore, when considering a disclosure statement, bankruptcy courts should review and determine if a plan associated with such disclosure statement is confirmable. *In re Pecht (Pecht II)*, 57 B.R. 137, 139 (Bankr. E.D. Va. 1986). If a plan is not confirmable on its face, the court should not then "subject the estate to the expense of soliciting votes and seeking confirmation." *Id*. "Not only would allowing a nonconfirmable plan to accompany a disclosure statement, and be summarized therein, constitute inadequate information, it would be misleading and it would be a needless expense of the estate." *Id*.

23. Therefore, "[i]f the Court can determine from a reading of the plan that it does not comply with § 1129 of the Bankruptcy Code, then it is incumbent upon the Court to decline

---

[4] As noted below in the discussion regarding feasibility of the Plan, cash flow of Debtor is insufficient for this purpose.

8

approval of the disclosure statement . . . ." *Pecht II*, at 139; *see also In re Valrico Square Ltd. P'ship*, 113 B.R. 794, 796 (Bankr. S.D. Fla. 1990) (sustaining an objection to a disclosure statement of an unconfirmable plan and noting, "[s]oliciting votes and seeking court approval on a clearly fruitless venture is a waste of the time of the Court and the parties"). Here, the Plan is not confirmable, and, therefore, the Disclosure Statement cannot be approved.

    A.    *The Plan Is Not Feasible and Cannot Be Confirmed.*

24. The Plan is not feasible on its face and, therefore, cannot satisfy the requirements of Section 1129(a) of the Bankruptcy Code. To satisfy the feasibility requirement of the Bankruptcy Code, the confirmation of a plan must not likely be followed by a liquidation or need for further financial reorganization of the debtor or any successor. 11 U.S.C. § 1129(a)(11). Factors to be considered when judging the feasibility of a plan include the earning power of the business, the sufficiency of its capital structure, economic conditions of the business, whether the same management will continue to operate the company, and the managerial efficiency of those controlling the business after confirmation. *See In re Sovereign Oil Co.*, 128 B.R. 585, 586 (Bankr. M.D. Fla. 1991); *In re Thurmon*, 87 B.R. 190, 191 (Bankr. M.D. Fla. 1988) (citations omitted). "[T]he feasibility standard is whether the plan offers a reasonable assurance of success." *Kane v. Johns-Manville Corp.*, 843 F2d 636, 649 (2d Cir. 1988). "'The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promises creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation.'" *Pizza of Hawaii, Inc. v. Shakey's Inc. (In re Pizza of Hawaii, Inc.)*, 761 F.2d 1374, 1385 (9th Cir. 1985) (quoting 5 Collier on Bankruptcy ¶1129.02 [11] at 1129-34 (15th ed. 1984)).

25. The proper inquiry is whether a debtor has established its "post confirmation viability and its ability to meet its future obligations. It is therefore critical that Debtor demonstrate that any necessary financing or funding has been obtained, or is likely to be obtained. With or without this financing, however, section 1129(a)(11) requires a debtor to show concrete evidence of a sufficient cash flow to fund and maintain both its operations and obligations under the plan." *In re Trans Max Techs., Inc.*, 349 B.R. 80, 92 (Bankr. D. Nev. 2006) (citations and quotations omitted). A meaningful feasibility review must be done "to prevent reorganization from becoming a revolving door for frangible firms doomed to fail again and again." *Id*.

26. In the current case, Debtor has failed to show that the Plan is feasible. Instead, much like with the liquidation analysis, Debtor merely states the requirement for feasibility and concludes (without analysis) that it "believes it will be able to provide the payments contemplated under the Plan based upon its post-petition cash flow and the substantial equity in its real property." (Disclosure Statement, p. 22.) This conclusory remark does not "show concrete evidence of a sufficient cash flow to fund and maintain both its operations and obligations under the plan" as required by Section 1129(a)(11) of the Bankruptcy Code. *See In re Trans Max Techs., Inc.*, 349 B.R. 80, 92 (Bankr. D. Nev. 2006).

27. The Disclosure Statement also provides as follows: "The Debtor will file a pro forma financial statement within fourteen days of this disclosure statement itemizing such cash flow and payments to creditors." (Disclosure Statement, p. 22.) It has now been over a month since the Disclosure Statement was filed, and Debtor has not filed any such "financial statement … itemizing such cash flow and payments to creditors." Thus, the Disclosure Statement remains completely lacking in any information necessary for creditors to determine the feasibility of the

Plan. Thus, the Disclosure Statement does not provide "adequate information" as required by Section 1125 of the Bankruptcy Code.

28. Indeed, some simple math actually shows that the opposite of Debtor's conclusory remark is true – i.e., the Plan is not feasible. For example, the Plan provides for a complex treatment of the Claim which begins with interest only payments on the allowed amount of the Claim for a period of eighteen months followed by interest and some portion of principal payments for the next eighteen months. Based upon the current financial information available, Debtor cannot even make the lesser, interest only payments proposed to be paid during the first eighteen months. Specifically, Debtor proposes to pay 0.5% over the Prime Rate. Such rate would be 4.0% based upon a current Prime Rate of 3.5%. Even if one utilizes the $47.6 million Claim amount stated by Debtor in the Disclosure Statement, the interest only payments would be $158,666.67 per month. As set forth in Debtor's budget attached to the Fourth Interim Order Granting Debtor's Emergency Motion for Authority to Use Cash Collateral Pursuant to 11 U.S.C. § 363 (Docket No. 72), the Collateral only generates a cash flow of $134,367.65 each month. Therefore, the cash flow is not even enough to cover the interest only payments on the Claim of $158,666.67; it falls short by more than $24,000. However, as stated, the actual allowed amount of the Claim is $52,213,696.21. Utilizing the correct allowed Claim amount, the interest only payments would be $174,045.65 per month (nearly $40,000 more than Debtor would have available in cash flow on a monthly basis). Of course, these calculations do not even account for any other payments proposed to be made to any other creditors under the Plan.

B. *The Plan is Not Fair and Equitable.*

29. Pursuant to Section 1129(b)(2)(A)(i) of the Bankruptcy Code, a plan is not fair and equitable with respect to a secured creditor unless the plan provides that such secured

11

creditor will both (a) retain its lien, and (b) receive deferred cash payments that total at least the amount of such secured creditor's claim and that are of a value, as of the effective date of the plan, of at least the value of the secured creditor's collateral.

30. The treatment proposed in the Plan with respect to the Claim does not satisfy the requirements of Section 1129(b)(2)(A)(i) of the Bankruptcy Code as the Plan does not state that Hanover shall retain its lien in the Collateral. Instead, Section 8.10 of the Plan states that all assets "shall re-vest in the Reorganized Debtor on the Effective Date, *free and clear of all Liens, Claims and interests* of holders of Claims and Equity Interests." (Plan, p. 23 (emphasis added).) Accordingly, the Plan is not fair and equitable with respect to Hanover's secured Claim, and confirmation should be denied.

    C.    *The Plan is Not Proposed in Good Faith*

31. Section 1129(a)(3) of the Bankruptcy Code provides that, in order for a plan to be confirmed, it must be "proposed in good faith and not by any means forbidden by law." The Plan fails to meet this requirement for at least two reasons—(i) it seemingly provides a discharge of the non-debtor guarantor's the Loan obligations and (ii) it provides immunity to insiders from clearly meritorious avoidance actions.

32. Both Sections 8.12 (Discharge of Debtor) and 8.13 (Injunction Related to Discharge) of the Plan extend to "Equity Interests in the Debtor." John B. Kennelly is the holder of 96.1% of the interests in Debtor. Mr. Kennelly is also the guarantor of the Loan obligations. Debtor's reliance upon these provisions providing a discharge of Equity Interests in Debtor and an injunction against any collection activities against Equity Interests in Debtor could be construed as Debtor's attempt to provide a discharge of Mr. Kennelly (a non-debtor) from his

obligations as guarantor of the Loan. Such discharge and related injunction in favor of Mr. Kennelly would be improper. Accordingly, the Plan is proposed in bad faith.

33. Section 8.17 of the Plan, addressing avoidance actions under Section 547 of the Bankruptcy Code, provides, in relevant part, as follows:

> In this case, the Debtor believes payments made to creditors prior to the Petition Date are not avoidable under Section 547 of the Code because, among other things, the Debtor made payments while it was solvent and/or in the ordinary course of business, and such payments may not have enabled creditors to receive more than they would in a liquidation.

(Plan, p. 25.). This statement by Debtor is made in bad faith. First, for Debtor to declare that it was solvent within the relevant periods for Bankruptcy Code Section 547 preferences (i.e., 90 days prior to the Petition Date for non-insider transferees and one year prior to the Petition Date for insider transferees) is completely and unabashedly inaccurate. As stated, at the Petition Date, Debtor was approximately twelve months in arrears on its monthly payments due under the Loan. Thus, during such time, Debtor was clearly not paying its debts as they came due in the ordinary course of business. Second, Rule 2004 examinations of both John B. Kennelly (96.1% equity holder in Debtor and guarantor of the Loan) and his son, John S. Kennelly were conducted by Hanover. Those examinations revealed numerous large transfers of Debtor's cash to both gentlemen in the period of time prior to the Petition Date. Indeed, significant cash transfers were made to John S. Kennelly within a day of the Petition Date.[5] In light of Debtor's guarantor/principal and/or his son having received significant cash transfers in the year prior to the Petition Date (and indeed, right before the Petition Date), it is bad faith for Debtor to propose that no avoidance actions with merit exist. This is particularly true when, as shown above with respect to feasibility of the Plan, Debtor does not have sufficient cash flow to pay the amounts

---

[5] Proof of these transfers is not attached to this Objection. However, such evidence will be provided at a later date if necessary.

13

the Plan proposes to pay to creditors. Thus, prosecution of the avoidance actions against John B. Kennelly and/or his son, John S. Kennelly, would be necessary and appropriate. However, instead, Debtor has taken the position that, even though such funds would be necessary for Debtor to have any chance of implementing the Plan, it is going to self-serve its insiders by insulating them from clearly valid avoidance actions which would provide additional funds necessary to pay creditors.

D. *The Plan Violates the Absolute Priority Rule.*

34. The Plan also violates Section 1129(b)(2)(B) of the Bankruptcy Code. That section requires, for an impaired class of unsecured claims that has not accepted the plan, that either (a) the class receive property equal to the full value of the claims, as of the effective date of the plan, or (b) no claim or interest junior to the claims of the unsecured class receive or retain under the plan such junior claim or interest (commonly referred to as the "absolute priority rule").

35. The absolute priority rule requires that, in order to cram-down a plan over the objections of a senior class of unsecured creditors, either the unsecured creditor will receive the full amount of its claim with appropriate interest so that it receives the present value of its claim, or no junior class of stakeholder can receive any property "on account of" such interest. *Bank of America Nat'l Trust & Savings Assoc. v. 203 North LaSalle Street Partnership*, 526 U.S. 434, 441-42 (1999) (citing 11 U.S.C. § 1129(b)(2)(B)(ii)). In other words, when senior unsecured creditors are not being paid in full, the old equity holders cannot receive ownership interests in the reorganized entity "because of" their old equity interests. *Id*. at 450-51.

36. In the current case, Debtor is reinstating the equity interests of the current equity holders when it is clear that Debtor does not have the means to pay all creditors in full.

**RESERVATION OF RIGHTS**

Nothing contained in this Objection should be construed to limit any objections that Hanover has or will raise in connection with confirmation of the Plan. Hanover reserves all of its rights to assert any of the objections contained herein, as well as any additional objections in connection with confirmation of the Plan.

WHEREFORE, Hanover respectfully requests that the Court enter an order (i) denying approval of the Disclosure Statement, (ii) finding (a) that the Disclosure Statement fails to contain "adequate information" as required by section 1125 of the Bankruptcy Code and (b) that the Plan is not confirmable on its own terms; and (iii) granting Hanover such further relief as may be just and proper.

Respectfully submitted, this 8th day of June, 2016.

McGUIREWOODS LLP

By   */s/ Thomas R. Walker*
Sara F. Holladay-Tobias (FL Bar No. 26225)
Courtney A. McCormick (FL Bar No. 92879)
50 N. Laura Street, Suite 3300
Jacksonville, Florida 32202
(904) 798-3200
(904) 798-3207 (fax)
cmccormick@mcguirewoods.com

-and-

Thomas R. Walker *(Admitted Pro Hac Vice)*
1230 Peachtree Street N.E., Suite 2100
Atlanta, GA 30309
(404) 443-5705
(404) 443-5763 (fax)
trwalker@mcguirewoods.com

*Attorneys for Hanover Acquisition 3 LLC*

## **CERTIFICATE OF SERVICE**

      I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using CM/ECF on June 8, 2016.  I also certify that the foregoing document is being served this day on the following counsel of record via transmission of Electronic Filing generated by CM/ECF:

Bradley S. Shraiberg on behalf of Debtor
bshraiberg@sfl-pa.com

Patrick R Dorsey on behalf of Debtor Fountains of Boynton Associates, Ltd.
pdorsey@sfl-pa.com, ematteo@sfl-pa.com;dwoodall@sfl-pa.com;scusack@sflpa com;bshraibergecfmail@gmail.com

Orfelia M Mayor on behalf of Creditor Palm Beach County Tax Collector
omayor@ombankruptcy.com,
legalservices@pbctax.com;carmen@ombankruptcy.com;cmbk@ombankruptcy.com;omayor@ecf.inforuptcy.com

Office of the US Trustee
USTPRegion21.MM.ECF@usdoj.gov

Harry J Ross, Esq on behalf of Interested Party Warren's Shell, Inc.
hross@hjrlaw.com, jerri@hjrlaw.com

Harry J Ross, Esq on behalf of Interested Party Warren Seckler
hross@hjrlaw.com, jerri@hjrlaw.com

Bradley S Shraiberg on behalf of Debtor Fountains of Boynton Associates, Ltd.
bshraiberg@sfl-pa.com, dwoodall@sfl-pa.com;lrosettoparr@sfl-pa.com;scusack@sfl-pa.com;blee@sflpa. com;bshraibergecfmail@gmail.com;ematteo@sfl-pa.com

                                                                */s/ Courtney A. McCormick*
                                                                        Attorney

79041557v2